Mayra RUBIO, Daniel Powers and Darrel Honick, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

CHOCK FULL O'NUTS CORPORATION, Chock Full O'Nuts Corporation 1988 Severance Policy, Sara Lee Corporation, Sara Lee Corporation Employee Benefits Administrative Committee and Sara Lee Corporation Employee Benefit Appeal Subcommittee, Defendants.

No. 01 Civ. 4328(VM).

United States District Court,
S.D. New York.

March 31, 2003.

Ted Poretz, Bingham Dana, L.L.P., New York City, for Plaintiffs.

Terri Lynn Ross, McDermott, Will et ano., New York City, for Defendants.

### *DECISION AND ORDER*

MARRERO, District Judge.

This case is a class action brought on behalf of approximately 250 former employees of Chock Full O'Nuts Corporation ("CFON"), who were involuntarily terminated, other than for cause, disability, sale of a business or death, within two years after the October 18, 1999 acquisition of CFON by Sara Lee Corporation ("Sara Lee"), and who were denied continuing welfare benefits under certain welfare benefit plans established by CFON (the "Class") and administered by various named defendants. The Class was certified by stipulation between the parties, dated December 12, 2001, and So Ordered by the Court on January 28, 2001 pursuant to Fed.R.Civ.P. 23(b)(3). The Class seeks recovery for benefits it alleges defendants wrongfully withheld from its members, and to enforce and clarify its rights to future benefits under the terms

of the CFON Severance Policy in accordance with §§ 502(a)(1)(B) and 502(a)(3) of the Employment Retirement Income Security Act of 1974 ("ERISA") and under a pendent state law theory of relief for breach of contract. Plaintiffs Mayra Rubio ("Rubio"), Daniel Powers ("Powers") and Darrel Honick ("Honick"), on behalf of themselves and the Class (collectively, "Plaintiffs" or the "Class"), move for summary judgment pursuant to Rule 56 of the Fed.R.Civ.P. on their claims against all defendants. Defendants CFON, Chock Full O'Nuts Corporation 1988 Severance Policy, Sara Lee, Sara Lee Corporation Employee Benefits Administrative Committee ("EBAC") and Sara Lee Corporation Employee Benefits Appeal Subcommittee ("Appeal Subcommittee") (collectively, "Defendants") cross-move for summary judgment dismissing the claims against them. For the reasons set forth below, Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part, and Defendants' motion for summary judgment is DENIED in part and GRANTED in part.

## I. BACKGROUND

As stipulated, there are no material facts in dispute between the parties. (*See* Stipulation of Undisputed Facts ("Stipulation"), dated June 26, 2002, signed by both parties and So Ordered by the Court; Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem."), dated September 18, 2002, at 1; Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment Against All Defendants ("Pl. Mem."), dated September 18, 2002, at 1.) Accordingly, the task before the Court is the proper application of the law to the

facts at hand, not deciphering issues of disputed fact. For the purpose of clarity, the Court sets forth the facts of the case it deems most important.[1]

CFON created the Chock Full O'Nuts Severance Policy (the "Severance Plan") on May 24, 1998. (*See* Severance Plan, attached as Exh. C. to the Poretz Aff.) During and following their employment at CFON, the Class members were participants in the Severance Plan, as the term "participant" is defined in ERISA. In addition to the Severance Plan, during their employment at CFON, the Class members were eligible to participate in CFON's Life and Accidental Death & Dismemberment Plan, effective June 1, 1995; the 401(k) Plan, effective May 1, 1996; the Group Benefit Plan, effective June 1, 1998; and the Long–Term Disability Benefit Plan, effective June 1, 1998 and corresponding successor plans sponsored by Sara Lee (collectively, "CFON Welfare Plans"). In fact, many Class members were participants in the CFON Welfare Plans.

The Severance Plan was created by CFON to provide severance benefits for employees whose employment is "involuntarily terminated other than on account of Cause, Disability, Sale of a Business ... or the Employee's death." (Severance Plan § 1.) The essence of the dispute between the parties concerns the interpretation of a specific provision of the Severance Plan, which determines enhanced severance payments and credit for service under the CFON Welfare Plans:

> An Employee shall be credited with a number of weeks of service equal to the number of weeks of Base Pay he receives or is entitled to receive as a Sev-

---

1. The factual summary that follows derives primarily from Pl. Mem., Def. Mem., the Stipulation, the Class Action Complaint (hereinafter, "Complaint" or "Compl."), dated May 18, 2001, attached as Exh. A to the Affidavit of

Ted Poretz ("Poretz Aff."), dated September 17, 2002, and accompanying exhibits and affidavits. Except where specifically referenced, no further citation to these sources will be made.

erance Benefit Payment for the purpose of determining eligibility, vesting and accrual service under all employee benefit plans of the Company, including, but not limited to, group health and life insurance, long-term disability, the Chock Full O'Nuts Corporation Pension Plan, and the Greenwich Mills Company retirement plan.

(Severance Plan § 7.4.) Defendants and Plaintiffs present two distinct interpretations of this provision of the Severance Plan, resulting in different understandings of what benefits the Class is entitled to under the CFON Welfare Plans upon a qualifying termination.[2]

The Severance Plan provides that "the Board of Directors of the Company, or a committee appointed by the Board shall be responsible for implementing, administering and interpreting the Provisions of this Policy." (Severance Plan § 11.) The term "Company" is defined in the Severance Plan as "[CFON] and any successor thereto, including, without limitation, any person ..., partnership(s) or corporation(s) acquiring directly or indirectly all or substantially all of the business or assets of [CFON]." (Severance Plan § 5.6.) Following the merger between CFON and Sara Lee described below, on February 18, 2000, the Board of Directors of CFON, essentially functioning as a board of directors for a division of Sara Lee, adopted certain resolutions ("CFON Resolutions"), which provided that the Sara Lee EBAC "shall be the plan administrator of the Plans"[3] and that the EBAC

shall have all of the powers, rights and duties necessary or advisable in order to fully perform the applicable responsibilities imposed by ERISA upon plan ad-

ministrators (including the authority to delegate or allocate any of those powers in writing in a prudent and reasonable manner consistent with ERISA); and in the case of any Plan or related Trust which provides that the plan administrator shall be the Company or a committee of this Board, the responsibility of serving as plan administrator and all of said necessary or advisable powers, rights and duties are hereby fully delegated to the [EBAC].

(Stipulation Exh. O at 1–2.) Thereby, the EBAC became a committee appointed by the CFON Board of Directors, which, according to the Severance Plan, was authorized to undertake the responsibility of "implementing, administering and interpreting" the provisions of the Severance Plan.

According the testimony of John Clousing ("Clousing"), Sara Lee's Director of Employee Benefits and Chairman of the Appeal Subcommittee, the EBAC was appointed by the Sara Lee Board of Directors in the late 1970's to administer Sara Lee ERISA plans. (Deposition of John Clousing ("Clousing Dep."), attached as Exh. N to the Poretz Aff. at 257–258.) However, Defendants indicate that they can not locate the original Board Resolution that created the EBAC. (Def. Mem. at 2 n. 2.) The documentation that is provided concerning the EBAC is more recent. On January 27, 1994, the Board of Directors of Sara Lee adopted certain resolutions ("Sara Lee Resolutions") that detailed the duties and composition of the EBAC, giving the EBAC the same authority and responsibilities as the CFON Board of Directors later conferred upon the EBAC in

---

**2.** For the purposes of the instant action, the Class's rights under the CFON pension plan are not in dispute.

**3.** The term "Plans" is defined in the CFON Resolutions to include "various tax-qualified

and non-qualified pension plans, welfare plans, and other employee benefit plans or programs for the benefit of its eligible employees, former employees and retirees ....."
(*See* Poretz Aff. Exh. O.)

the CFON Resolutions. (Stipulation Exh. H at 1.)

On August 11, 1993, the EBAC, functioning at that time as the administrator of Sara Lee ERISA plans and having as of yet no relationship to CFON, issued "Committee Resolutions" in which the EBAC delegated certain of its appointed responsibilities to the Appeal Subcommittee. (Stipulation Exh. J.) In particular, the EBAC delegated to the Appeal Subcommittee the authority "to review appeals of decisions denying benefits under any other ERISA plan maintained by Sara Lee Corporation or any of its subsidiaries where the amount of the benefits that are subject of the appeal does not exceed $50,000 and to render final decisions with respect to such appeals...." (*Id.* at 1.) Thereafter, on February 28, 1997, the EBAC again adopted certain resolutions vesting the Appeal Subcommittee with authority to review appeals of benefit denial claims under Sara Lee's ERISA plans. (Stipulation Exh. K.)

Sara Lee acquired CFON in a hostile takeover that resulted in the merger between CFON and Sara Lee on October 18, 1999 (the "Merger"). On that day, Marvin I. Haas ("Haas"), then CEO of CFON, distributed a memo to all 850 employees covered by the Severance Plan (the "Haas Memo"). (Poretz Aff. Exh. F.) The Haas Memo, dated October 15, 1999, provided official notice to employees of the Merger and explained that the Merger would be characterized as a "Change in Control," entitling terminated employees to enhanced benefits under various CFON benefit plans, including the Severance Plan. The Haas Memo also summarized the enhanced benefits employees would be entitled to in light of the "change in control" situation. Among the other benefits discussed, the Haas Memo sets out in some detail the "Enhanced Severance Benefits" under the

Severance Plan, listing conditions entitling the employees to the enhanced severance benefits, indicating certain disqualifying conditions, and explaining the means of calculating the enhanced benefits generally, and by way of two illustrations. (*Id.* at 1.) The Haas Memo asserts that an employee covered by the Severance Plan who is terminated in a "qualifying termination" within two years following a "change in control" is eligible for twice the severance pay of Severance Plan participants severed prior to a change of control. (*Id.*) In addition, the Haas Memo indicates that the Severance Plan provides participants with certain benefits as to "eligibility to participate, vesting and accrual" under all employee benefit plans of CFON. (*Id.* at 2.) The nature and extent of these benefits is the subject of the dispute in this case and depends on the interpretation of § 7.4 of the Severance Plan.

In January 2000, various members of the Sara Lee Benefits and Human Resources Department, including Clousing, Vincent Pellettiere ("Pellettiere"), and Julie Dreixler ("Dreixler"), met with outside counsel from McDermott, Will and Emery ("McDermott") to consider the proper application of § 7.4 of the Severance Plan to employees terminated within two years of the Merger, which would qualify them for enhanced benefits under the Severance Plan (the "January 2000 Meeting"). The participants concluded that the Severance Plan did not contemplate extending coverage of CFON Welfare Plans beyond the date an employee is terminated. Rather, the participants in the January 2000 Meeting determined that, based on the language of the Severance Plan, as well as past practice in applying the Severance Plan, § 7.4's reference to credit of weeks of service for purposes of determining "eligibility, vesting and accrual service" refers to a former employee's eligibility for early

retirement or pension disability benefits, which frequently require a minimum period of service in order for an employee to be eligible, and not to extended weeks of coverage under the benefit plans.

The first CFON employee who filed a claim under the Severance Plan, whose employment was terminated by Sara Lee without cause after the Merger, was Michael Goldman ("Goldman"). In conjunction with that termination, and based upon the initial determination made by Sara Lee during the January 2000 meeting concerning benefits provided by the Severance Plan, Sara Lee provided Goldman with a letter, dated January 28, 2000, outlining the severance pay and benefits that Sara Lee was offering Goldman. (Stipulation Exh. Q.) Goldman disputed Sara Lee's determination in an email dated February 11, 2000, seeking coverage under all CFON employee benefit plans for the period he would receive severance payments under the Severance Plan. (Stipulation Exh. R.) Thereafter, on February 15, 2000, Pellettiere wrote to Goldman conveying the denial of his request, based on a review of Goldman's claim conducted by himself and Dreixler, two Sara Lee human resources employees.

Goldman continued to dispute his severance benefits and enlisted the help of an attorney, Jonathon Kenter ("Kenter"), then the trustee of the trust for the Severance Plan, who wrote certain letters on Goldman's behalf. (Stipulation Exhs. T, V.) Thereby, Goldman appealed the initial determination of his severance benefits.

On March 17, 2000, the Appeal Subcommittee met to review Goldman's appeal of the denial of his request for continued coverage under the CFON Welfare Plans. In preparation for this meeting, the Sara Lee Benefits Department gathered information relevant to Goldman's claim. The packet of information provided to the Appeal Subcommittee by the Sara Lee Benefits Department contained the Severance Plan, the Haas Memo, and the correspondence to and from Goldman and Kenter concerning Goldman's severance benefits. At the meeting, the Appeal Subcommittee unanimously concluded that the reference in § 7.4 to crediting the employee with a number of weeks of service "for the purpose of determining eligibility, vesting, and accrual service under all employee benefit plans" refers to "eligibility service for participation", which they contended affects only "eligibility to participate" in the CFON Welfare Plans, but did not provide for "continued participation" in the plans for the severance period.

According to Defendants, this determination was based on the language of the Severance Plan, the reasoning behind Sara Lee's initial interpretation of the Severance Plan, the failure of CFON to have modified the CFON Welfare Plans to provide for participation during the severance period, and past practice of CFON, which they understood to have been to deny continued participation in welfare plans to severed employees. On May 17, 2000, Sara Lee sent Goldman a detailed letter, signed by Clousing, explaining the Appeal Subcommittee's denial of his claim for continued coverage through the severance period under the CFON Welfare Plans, and CFON Incentive (Stock Option) Compensation Plan. (Stipulation Exh. X.)

During the two-year period beginning on October 18, 1999, the date of the Merger, Sara Lee terminated the employment of approximately 250 former CFON employees. For each terminated employee, Sara Lee provided the severance pay called for by the Severance Plan. Sara Lee did not provide the terminated CFON employees with continued group medical, dental, life, long-term disability and "all other employee benefit plans" for the same number of weeks as it paid severance pay.

Rubio, Powers and Honick, as well as other members of the Class, filed claims to receive continuing coverage under the welfare benefit plans coterminous with their period of severance pay. These claims were denied in subsequent correspondence signed by Clousing ("Denial Letters").

With respect to members of the Class who were terminated after Goldman, the Appeal Subcommittee agreed that the substance of claims by such individuals would likely be identical to Goldman's claim and that it would be futile to require such individuals to go through the appeals process. Accordingly, in connection with the Class members' claims for benefits under the Severance Plan, Sara Lee entered into a stipulation in June 2001, which provides that, if the Class were to appeal denial of their claims under § 7.4 of the Severance Plan, then Sara Lee would apply the same analysis and reach the same conclusion as it reached on Goldman's claim. (Stipulation Exh. Z.) The parties therefore agree that, to the extent there exists a requirement to exhaust administrative remedies before filing suit under ERISA, the Class need not fulfill this requirement and the Appeal Subcommittee's determination of Goldman's claim is deemed to determine any similar claim that would have been made by a member of the Class. Accordingly, in this action, the Class members' challenge the denial of Goldman's appeal to the Appeal Subcommittee as it relates to each of their claims for extended benefits under the Severance Plan.

## II. DISCUSSION

### A. STANDARD OF REVIEW: RULE 56

In connection with a Rule 56 motion, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding a motion for summary judgment, a court should not attempt to resolve all factual issues; rather, it should weigh facts that are not in dispute in order to see whether they render additional adjudication necessary. The moving party bears the burden of proving that no genuine issue of material fact exists or that due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994). The Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Id.* at 1223.

### B. STANDARD OF REVIEW: ERISA

ERISA explicitly authorizes suits against fiduciaries and plan administrators to remedy statutory violations, including breaches of fiduciary duty and of compliance with benefit plans, but does not set forth a standard for court review of a claim for benefits. *See* 29 U.S.C. §§ 1132(a), 1132(f); *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 108–109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Turay v. Aetna U.S. Healthcare*, 160 F.Supp.2d 557, 560 (S.D.N.Y.2001). Guided by principles of trust law, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948. In further elaboration of this holding, the Supreme Court explained that under relevant principles of contract law, "[i]f the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms," the court

should review the employee's claim as it would have any other contract claim by looking at the terms of the plan and other manifestations of the parties' intent. *Id.* at 112–113, 109 S.Ct. 948. If an express delegation of discretionary authority is included within the benefit plan, courts are instructed to review an authorized fiduciary's determination with deference, not disturbing the determination unless it is arbitrary and capricious. *See Id.* at 115, 109 S.Ct. 948; *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995).

Plaintiffs and Defendants dispute the appropriate standard to be applied in this case. Plaintiffs argue that the de novo standard of review should be applied by the Court because the Appeal Subcommittee, which made the final determination as to the proper interpretation of § 7.4 of the Severance Plan, did not have discretionary authority under the Severance Plan to interpret its terms. In contrast, Defendants assert that the EBAC, which they argue did have the requisite authority to interpret the Severance Plan, properly delegated its authority by written resolution to the Appeal Subcommittee, which therefore had discretionary authority to interpret § 7.4 of the Severance Plan. Thus, Defendants argue that the Appeal Subcommittee's determination should be reviewed under the arbitrary and capricious standard of review.

■ The Severance Plan confers upon the "Board of Directors of the Company, or a Committee appointed by the Board" the responsibility for "implementing, administering and interpreting the provisions of this Policy." (Severance Plan § 11.)

Although the language in the Severance Plan does not explicitly confer "discretionary" authority on the Board of Directors or a committee appointed by the Board, as emphasized in *Firestone,* the explicit conferral of ultimate responsibility for the inherently discretionary act of interpreting the provisions of the Severance Plan is sufficient to bestow discretionary authority, triggering the arbitrary and capricious standard of review. *See Firestone,* 489 U.S. at 112, 109 S.Ct. 948 ("discretionary or final authority" necessary to trigger deferential review); *Ganton Tech., Inc. v. Nat'l Indust. Group Pension Plan,* 76 F.3d 462, 466 (2d Cir.1996) (arbitrary and capricious standard appropriate where the plan explicitly provided that the trustees had the authority to "resolve all disputes and ambiguities relating to the interpretation of the Plan."); *O'Shea v. First Manhattan Co. Thrift Plan & Trust,* 55 F.3d 109, 112 (2d Cir.1995) (ERISA plan granting trustees the authority to "determine any questions arising in the administration, interpretation, and application of the Plan, which determination shall be binding and conclusive ...." suffices to invoke the arbitrary and capricious standard); *Pagan,* 52 F.3d at 441–442; *Hogan v. Metromail,* No. 99 Civ. 11204, 2002 WL 373245, at *15 (S.D.N.Y. March 8, 2002).

■ Plaintiffs do not dispute that the Board of Directors or a committee appointed by the Board, which in this case is the EBAC,[4] possesses the requisite discretionary authority for its interpretation of the Severance Plan to be afforded deferential review. (Pl. Mem. at 13.) However, Plaintiffs vigorously dispute Defendants'

---

4. Although the EBAC was originally appointed by the Board of Directors of Sara Lee, and not the Board of Directors of CFON, as directed in the Severance Plan, the EBAC is properly appointed under the Severance Plan because (i) after the Merger, the Board of Directors of CFON, then a subdivision of Sara Lee, appointed the EBAC as administrator under the Severance Plan and (ii) the definition of "Company" in the Severance Plan provides for a successor company to replace CFON upon the occurrence of a buyout or merger, thereby substituting the Sara Lee Board for the CFON Board.

contention that the conferral of discretionary authority on the EBAC, which in turn conferred authority on the Appeal Subcommittee, entitles the Appeal Subcommittee's interpretation of the Severance Plan to receive deferential treatment. Because the Severance Plan itself only authorizes the Board of Directors or a committee appointed by the Board, and does not explicitly allow for any further delegations of authority by an appointed committee to a subcommittee, Plaintiffs argue that de novo review of the Appeal Subcommittee's determination is appropriate.

■ Under ERISA, a named fiduciary may delegate its fiduciary responsibilities: "The instrument under which a plan is maintained may expressly provide for procedures ... (B) for *named fiduciaries to designate persons* other than named fiduciaries to carry out fiduciary responsibilities under the plan." ERISA, 29 U.S.C. § 1105(c)(1) (1988) (emphasis added). In accordance with the express language of ERISA, a number of courts have held that, although the delegation of fiduciary responsibilities is permissible, the authority of named fiduciaries to designate fiduciary responsibilities must be expressly provided for in the ERISA plan. *See Madden v. ITT Long Term Disability Plan for Salaried Employees,* 914 F.2d 1279, 1284 (9th Cir.1990) (delegation of fiduciary authority is appropriate where the ERISA plan expressly authorizes the named fiduciary to designate another person as fiduciary for the administration of the plan); *Bali v.*

*Blue Cross & Blue Shield Ass'n,* 873 F.2d 1043, 1047 n. 7 (7th Cir.1989) (noting that contract delegating authority to construe ERISA plan is not the " 'benefit plan', and it is to the benefit plan that the Court in *Firestone Tire* refers."); *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 584 (1st Cir.1993) (delegation of fiduciary responsibility is appropriate if properly provided for in ERISA plan); *Davidson v. Liberty Mutual Insurance Co.,* 998 F.Supp. 1, 8–9 (D.Me.1998) (designation of fiduciary responsibilities by named fiduciaries is only proper if provided for under the ERISA plan at issue); *Doe v. Travelers Ins. Co.,* 971 F.Supp. 623, 635 (D.Mass. 1997), *aff'd in part and rev'd in part by,* 167 F.3d 53, 57 (1st Cir.1999)[5] (de novo review required where fiduciary failed to point to a plan provision that allowed a fiduciary to delegate fiduciary duties).

Although the Court finds no case in the Second Circuit that is directly on point as to whether the authority to delegate discretionary functions must be expressly provided for in the ERISA plan, or whether a written delegation of authority by a named fiduciary is sufficient, the Court is persuaded that *Madden* states the proper rule.

In *Firestone,* the Supreme Court emphasized its reliance on principles of trust law in determining the proper approach for courts to take when reviewing an ERISA plan fiduciary's determination. *See* 489 U.S. at 111–115, 109 S.Ct. 948. In construing ERISA, *Firestone* notes that

---

**5.** The First Circuit affirmed the district court's holding for the plaintiff but applied the arbitrary and capricious standard, instead of the de novo standard applied by the district court. In its review of the district court's holding, the First Circuit did not reach the issue of delegation, indicating that "[w]e bypass these latter [procedural errors and improper delegations of authority] concerns by assuming that review is merely for reasonableness and by concluding that even under

this favorable standard [Defendants] denial of benefits, tested against the relevant record, was unreasonable in this case." *Doe,* 167 F.3d at 57. In other words, the First Circuit did not reach the issue of the proper standard of review on appeal because it held that regardless of the standard applied, the defendants' interpretation was unreasonable and could not be upheld. The Court reversed the district court's decision on another unrelated ground.

"ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans' and 'to protect contractually defined benefits.'" *Id.* at 113, 109 S.Ct. 948 (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). Accordingly, the Supreme Court held that ERISA can not be found to afford less protection than trust principles would have afforded prior to ERISA's enactment. *See Firestone,* 489 U.S. at 114, 109 S.Ct. 948. Although, trust principles accord substantial deference to the actions of trustees upon judicial review, the power to act as a trustee or fiduciary must be explicitly enunciated in the trust instrument. *Id.* at 114–115, 109 S.Ct. 948. Applying trust law to the ERISA context, the *Firestone* court emphasized that "[i]f the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms, the court reviewed the employee's claim as it would have any other contract claim ..." *Id.* at 112–113, 109 S.Ct. 948. In other words, for the de novo standard not to be applicable, discretionary authority must be explicitly allocated in the plan to a particular named fiduciary—not through subsequent delegations of authority.

In this case, the Board of Directors of Sara Lee appointed the EBAC, which appointment was later confirmed by the Board of Directors of CFON, in accordance with the Plan: "the Board of Directors of the Company, or a committee appointed by the Board shall be responsible for implementing, administering and interpreting the Provisions of this Policy." (Severance Plan § 11.) The EBAC therefore was properly appointed with discretion to interpret the Plan. However, nothing in the Severance Plan allows the EBAC to delegate these crucial fiduciary responsibilities, with ultimate binding ef-

fect, to a subcommittee, the members of which in this case were entirely different from the members of the EBAC (Stipulation ¶ 29). Therefore, absent a provision in the Severance Plan empowering the committee appointed by the Board to delegate its responsibilities with such legal finality, the Appeal Subcommittee's determination must be reviewed by the Court de novo.

■ The burden of proving that the arbitrary and capricious standard of review is proper falls upon Defendants. *See Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 229 (2d Cir.1995) ("[T]he party claiming deferential review should prove the predicate that justifies it.") Defendants do not put forward any law to support their assertion that the delegation by the EBAC to a subcommittee of non-EBAC members was a proper delegation of authority despite the fact that such a delegation was not expressly provided for in the Severance Plan. Defendants simply contend that because the delegation occurred, in writing, by a named fiduciary to a subcommittee, in accordance with the Sara Lee Resolutions, (Stipulation Exh. H at 2), and reconfirmed by the CFON Resolutions, (Stipulation Exh. I at 1–2), it was proper.

However, even the language in the Sara Lee Resolutions authorizing a delegation of responsibility allows for more than one interpretation. The Sara Lee Resolutions indicate that as "plan administrator" the EBAC has the authority to delegate or allocate powers in writing in a reasonable manner consistent with ERISA and, in a separate clause, that "in the case of any Plan or related Trust which provides that the plan administrator shall be the Company or this Board or a committee of this Board, the responsibility of serving as plan administrator and all of said necessary or advisable powers, rights and duties are

hereby fully delegated to the EBAC." (Stipulation Exh. H at 2.) This provision can be construed to mean that in instances where the relevant ERISA plan designates for specific named fiduciaries as plan administrator—the Board or a committee appointed by the Board—the EBAC, and not any other delegated committee, is the appropriate fiduciary. The Sara Lee Resolutions do not expressly indicate that when an ERISA plan, such as the Severance Plan, specifies named fiduciaries to serve as plan administrator, those powers can also be delegated. Even less warranted is a purported delegation of final discretionary authority over plan interpretation and administration to nonmembers of the designated fiduciary committee. In addition, the Sara Lee Resolutions explicitly require that any such delegation be consistent with ERISA. In any event, it is the Severance Plan, and not Board resolutions, which control whether a fiduciary's determination is to be properly afforded deferential review.

Defendants further argue that any lack of delegation to the Appeal Subcommittee would have been cured by the CFON Resolutions appointing the EBAC as the plan administrator for all of CFON's employee benefit plans on February 19, 2000. (Stipulation Exh. I.) The CFON Resolutions are essentially an exact restatement of the authority given to the EBAC in the Sara Lee Resolutions. Defendants contend that the authority of the Appeal Subcommittee to decide appeals under the Severance Plan was ratified by the Board of Directors since at the time of the issuance of the CFON Resolutions, the Appeal Subcommittee already had been delegated the discretion to decide appeals under ERISA plans, such as the Severance Plan.

However, the only authority that is ratified in the CFON Board resolutions is the authority granted by the Board to the EBAC: "The Sara Lee Corporation Employee Benefits Administrative Committee . . . shall be the plan administrator of the Plans." (*Id.*) The CFON Resolutions, mirroring the language of the Sara Lee Resolutions, do not ratify the EBAC's delegation of its fiduciary responsibility to interpret the Plan to the Appeal Subcommittee. First, the express power given to the EBAC to delegate its powers in writing is explicitly conditioned on such delegation being consistent with ERISA. As explained above, ERISA provides for delegation of fiduciary powers only where the provision for delegation is included in the ERISA plan.

In addition, the CFON Resolutions, as did the Sara Lee Resolutions, explicitly refer separately to plans that provide that the Board of Directors or a committee appointed by the Board are to be the fiduciaries, and indicates that for such plans the EBAC would be the appointed committee to act as plan administrator. The CFON Resolutions do not ratify the Appeal Subcommittee's authority to interpret the Severance Plan since the CFON Resolutions do not appoint the Appeal Subcommittee to carry out this duty, or even mention the Appeal Subcommittee. Had the CFON Board of Directors wanted to appoint the Appeal Subcommittee to have final and discretionary responsibility for interpretation of the Severance Plan, a highly important delegation, the CFON Resolutions could have included such a delegation explicitly, but did not. Rather, the EBAC is clearly the committee with the ultimate responsibility for plan interpretation.

The Court's holding that the proper discretionary authority to interpret the Severance Plan rested in the EBAC, and not the Appeal Subcommittee, is also supported by the statement in the Denial Letters referring to the EBAC as having been the committee to have reviewed and de-

nied the claims for benefits. (Poretz Aff. Exh. L.) Defendants have since stipulated that "[t]he members of the Sara Lee EBAC ... never reviewed any claim made under the Severance Plan ..." (Stipulation ¶ 29; *see also* Clousing Dep. at 37–40.) Considering a similar fact pattern in *Doe*, the court found that the communication of the denial of benefits decision on the letterhead of the named fiduciary added to the difficulties characterizing the method and effect of the unauthorized delegation. 971 F.Supp. at 635. Here, too, the Appeal Subcommittee's denial of claims was made and transmitted in the name of EBAC, though EBAC played no actual role in the determinations, reinforcing the flaw in the purported delegation of authority to the Appeal Subcommittee.

Accordingly, because the Appeal Subcommittee and not the EBAC admittedly interpreted and applied the Severance Plan, *Firestone* directs that a reviewing court should not defer to the Appeal Subcommittee's determination under the arbitrary and capricious standard and should instead undertake a de novo review of its determination.[6]

## C. *THE HAAS MEMO*

The parties dispute the weight to be accorded the Haas Memo, which was sent as an "Update" concerning the Merger. (Poretz Aff. Exh. F.) Plaintiffs contend that the Haas Memo should be considered by the Court to be "in the nature of a summary plan description ("SPD") pursuant to 29 U.S.C. § 1022." (Pl. Mem. at 22 n. 26.) The Second Circuit has held that an employee should be entitled to rely on his or her reasonable reading of an SPD, even if the full plan contains provisions that conflict with that reading. *See Moriarity v. United Tech. Corp. Represented Employees Retirement Plan*, 158 F.3d 157, 160–162 (2d Cir.1998); *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2d Cir.1990) (ERISA "contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on descriptions ... in the summary. To allow the Plan to contain different terms that supersede the terms of the [SPD] would defeat the purpose of providing ... summaries.") Thus, if the Haas Memo were indeed to be accorded the status of an SPD, it should be given significant, and even controlling, weight in determining the proper interpretation of the Severance Plan. Defendants counter that the Haas Memo was an informal communication, not an SPD.

The Court concludes that the Haas Memo is not an SPD. ERISA requires that welfare benefit plans be governed by formal written plan documents that are prepared and filed in accordance with ERISA's reporting and disclosure rules.

---

**6.** Plaintiffs also argue that because the Severance Plan was operated under a conflict of interest, the standard of review in this case should be adjusted accordingly. The Supreme Court in *Firestone* held that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" 489 U.S. at 115, 109 S.Ct. 948. (internal citations omitted). However, despite the fact that a conflict of interest likely exists in this case, since the Court holds that a de novo standard of review is appropri-ate, the effect of such a conflict is not relevant. *Id*. Furthermore, as Defendants point out, the law in this Circuit is that the arbitrary and capricious standard of review is not even affected by a possible conflict of interest unless Plaintiffs can prove not only the existence of a conflict, but that the conflict of interest actually influenced a fiduciary's decision. *See Pagan*, 52 F.3d at 442; *Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1255 (2d Cir.1996). Such a standard of proof is difficult to meet, and beyond the scope of issues necessary for the Court to decide.

29 U.S.C. §§ 1022(a) and (b). An SPD is a mechanism for informing plan participants of the terms of the plan and benefits in a summary fashion. In particular, ERISA requires that "a summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries ..." 29 U.S.C. § 1022(a). ERISA lists in 29 U.S.C. § 1022(b) a description of twelve categories of information that must be included in an SPD. ERISA also requires that the plan administrator file the SPD with the Secretary of Labor. 29 U.S.C. § 1022(a). The Department of Labor ("DOL") regulations extend and amplify the types of information to be contained in the SPD. 29 C.F.R. § 2520.102–3 (1989).

■ While the Second Circuit has not squarely decided the issue of what minimal requirements are necessary for a document to constitute an SPD, the Circuit Court has determined that informal communications are not accorded the status or weight of SPDs. *See Moore v. Met. Life Ins. Co.*, 856 F.2d 488, 492–493 (2d Cir. 1988). The Court finds that the rule stated in *Hicks v. Fleming Co., Inc.*, 961 F.2d 537, 540–542 (5th Cir.1992), is most persuasive for identifying the existence of an SPD. In *Hicks*, the Fifth Circuit determined that "the appropriate test for determining if a document constitutes an SPD under ERISA is to see whether it contains all or substantially all categories of information required under 29 U.S.C. § 1022(b) and the Department of Labor's ("DOL") regulations at 29 C.F.R. § 2250.102–3 ..." *Id.* at 542. *See also Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1315 (3d Cir.1991); *Alday v. Container Corp. of America*, 906 F.2d 660, 665 (11th Cir.1990) ("Summary of Benefits Booklet" that did not fulfill the requirements for SPDs as set forth in ERISA does not constitute an SPD); *Yoran v. The Bronx–Lebanon Hosp. Ctr.*, No. 96 Civ. 2179, 1999 WL 378350, at *11 n. 8 (S.D.N.Y. June 10, 1998).

Although the *Hicks* court left open the possibility that a document containing not all but substantially all information required under ERISA and DOL regulations might be an SPD, the court indicates that this would be "an exception not the rule." *Id.* at 542 n. 17. In particular, the court in *Hicks* indicates that if a document was intended to be an SPD, but inadvertently leaves out some information, such a document could be considered an SPD. *Id.* However, what is stressed in *Hicks* is that for a document to be afforded the considerable legal significance of an SPD, which essentially supercedes the language of the ERISA plan itself, such a document should be sufficient for filing and qualification purposes and there should be no accidental SPDs that inadvertently change important ERISA welfare benefits. *Id.* at 542. This rule serves for the protection of both employers and participants. Employers should be encouraged to send information to participants, for their benefit, without having to file such documents with the DOL or feel apprehensive about the consequences, and the SPD requirement should not act as a trap for unwitting employers.

On the other hand, the standard urged by Plaintiffs articulated in *Kochendorfer v. Rockdale Sash & Trim Co. Inc.*, 653 F.Supp. 612, 615 (N.D.Ill.1987), sets an inclusive standard for defining SPDs: "any document a plan distributes to its participants which contains all or substantially all of the information the average participant would deem crucial to a knowledgeable understanding of his benefits under the plan shall be deemed a summary plan description." This subjective understanding of an SPD would chill communications by plan administrators and create confusion as to the controlling documents. Only documents that are intended to be SPDs, or contain all or substantially all of the information ERISA requires for a document to be deemed an SPD, should be given the weight and legal authority of SPDs.

Here, the Court finds that six of the twelve ERISA requirements and none of the additional DOL requirements are reflected in the Haas Memo. (Stipulation Exh. M.) Therefore, although informative, the information provided in the Haas Memo is not sufficient to transform it into an SPD. *See Yoran,* 1999 WL 378350, at *11 n. 8. Significantly, Defendants have indicated that it was not the express intention of CFON to issue the Haas Memo as an SPD and nothing contained in the Haas Memo represents to the reader that it was so intended. Rather, Defendants indicate that it was intended to inform CFON employees of the Merger and to quell fears brewing in the minds of CFON employees. Plaintiffs also do not allege that the Haas Memo was filed with the DOL, nor could it have been accepted by the DOL as an SPD. Moreover, the Haas Memo specifically indicates that the terms of the welfare plans described therein govern the determination of enhanced benefits referred to in the Haas Memo. *See Moore,* 856 F.2d at 492–493; *Gridley,* 924 F.2d at 1316.

In any event, the terms of the Haas Memo do not directly conflict with the Severance Plan; they only elaborate on the ambiguous language in the plan. Furthermore, whether or not the Class was entitled to rely on the Haas Memo is irrelevant in light of the fact that Plaintiffs do not assert a claim for promissory estoppel[7] and because, ultimately, the Court finds that under de novo review, Plaintiffs' interpretation of the Severance Plan itself is not unreasonable.

## D. THE DE NOVO STANDARD OF REVIEW

 Under the de novo standard of review, the Court considers the relevant documents in the record to determine the proper interpretation of the disputed provision in the Severance Plan. To the extent that the disputed provision is unambiguous, "an ERISA plan must be interpreted and enforced in accordance with its plain meaning." *Perreca v. Gluck,* 295 F.3d 215, 223 (2d Cir.2002). However, any ambiguities in an ERISA plan must be construed against the employer, as the drafter of the disputed document, in accordance with trust and contract principles of construction.[8] *Firestone,* 489 U.S. at 110–112, 109

---

**7.** Although district courts in this Circuit have found that evidence of reliance is necessary for the SPD to be given credence superceding the ERISA plan itself, the Second Circuit has discussed but not ruled upon the necessity of such reliance as a prerequisite to ERISA recovery. *See Moriarity,* 158 F.3d at 157–158 (2d Cir.1998); *Heidgerd,* 906 F.2d at 909; *Howard v. Gleason Corp.,* 901 F.2d at 1161 (2d Cir.1990) (reliance not found, but the court "leave[s] to another day the question of whether reliance upon a faulty plan document is a prerequisite to ERISA recovery.") Regardless, whether or not reliance is needed in this case is irrelevant, since the Court has found that the Haas Memo is not an SPD and because the Court finds that Plaintiffs' interpretation of the disputed provision is reasonable under the language of the Severance Plan itself.

**8.** Defendants argue that the *contra proferentem* rule of construction directing that ambig-

uous language should be constructed against the insurer, or drafters of the plan or contract, does not apply here because that doctrine applies only to interpretations of insurance policies. (*See* Defendants Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def.Opp.Mem."), dated October 17, 2002, at 9 n. 10) However, while the case Defendants cite for this proposition, *I.V. Servs. of Am. v. Trustees of the Am. Consulting Eng'rs Council Ins. Trust Fund,* 136 F.3d 114, 121–122 (2d Cir.1998), applies to an ERISA insurance plan, it in no way limits the relevance of the rule to insurance plans. While the *contra proferentem* rule of contract interpretation was drawn originally from the insurance context, it has been regularly applied in other circumstances as well. *See, e.g., Pabst Brewing Co. v. Thorley,* 145 F. 117, 126 (2d Cir.1906); *Schwartz v. Natwest Markets,* No. 99 Civ. 11010, 2001 WL 1006727, at *6 (S.D.N.Y. Aug. 31, 2001). While in *Masel-*

S.Ct. 948; *Masella v. Blue Cross & Blue Shield of Conn., Inc.,* 936 F.2d 98, 107 (2d Cir.1991). Furthermore, under the de novo standard of review, the burden is on Defendants to prove that Plaintiffs' interpretation of the Severance Plan is unreasonable. *Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 739 (2d Cir. 2001).

### E. *THE APPROPRIATE PLAN INTERPRETATION*

 The Court now turns to the task of applying the de novo standard to determine the proper interpretation of the Severance Plan, in particular § 7.4.

Section 7.4 credits a participant with weeks of service "equal to the number of weeks of Base Pay" he receives in severance pay for purposes of "determining eligibility, vesting and accrual service under all employee benefit plans of the Company, including, but not limited to, group health and life insurance, long-term disability, the [CFON] Pension Plan, and the Greenwich Mills Company retirement plan." Plaintiffs argue that the plain language of the Severance Plan, the black letter rules of construction, and common sense dictate that the proper interpretation of § 7.4 of the Severance Plan mandates treating the Class as active employees during the severance pay period so that the Class may participate in all CFON employee benefit plans for the same period of time as each Class member is eligible to receive severance pay under the Severance Plan. Defen-

dants claim that, based on the same principles, the credit of weeks of service for the CFON Welfare Plans refers to a former employee's eligibility for early retirement or pension disability benefits, which frequently require a minimum period of service in order for an employee to be eligible. Furthermore, Defendants contend that the credit of weeks of service also extends to any applicable waiting periods under the other CFON Welfare Plans, which could impact an employee's entitlement to COBRA benefits.[9] The practical effect of this dispute is that under Defendants' reading of § 7.4, entitlement of discharged employees to the benefits of group health and life insurance and other employee welfare plans would cease as of the date of the employees' actual termination, while under Plaintiffs' view their eligibility for such benefits would continue for the number of weeks during which they are entitled to receive severance pay under the Severance Plan.

Regardless of the merits of these two very different interpretations of the entitlements provided by the Severance Plan, the Court finds that, contrary to Defendants' contention, Plaintiffs' interpretation is not unreasonable. In the context of § 7.4, "eligibility", as used in the phrase "for the purpose of determining eligibility, vesting and accrual service" under various employee benefit plans, could be read as a noun enumerating one of three separate, stand-alone determinations for which a participant's weeks of severance pay is

---

*la,* 936 F.2d at 107, the Second Circuit applied this rule to interpret an ERISA insurance contract, it is also appropriate for other ERISA plans. *See Kascewicz v. Citibank,* 837 F.Supp. 1312, 1318 (S.D.N.Y.1993); *Keiser v. CDC Investment Management Corp.,* 160 F.Supp.2d 512, 520 (S.D.N.Y.2001).

9. Plaintiffs point out that the CFON medical plan and accidental death and dismemberment plan do not have applicable waiting

periods, making moot any "eligibility" credit participants might receive under that Severance Plan. Although this fact infuses some doubt into Defendants' interpretation, it is not dispositive because the CFON medical plan does refer to possible waiting periods, and because although § 7.4 of the Severance Plan refers to "all the employee benefit plans of the Company", all of the benefits provided under § 7.4 need not necessarily apply to all the plans mentioned.

employed to measure the duration of the employee's entitlement. Alternately, the term could be considered as an adjective, along with the two succeeding terms— "vesting" and "accrual"—modifying the word "service," in other words, as though the determination in question referred to only one concept: the participant's "service" under the benefits plans, which could take the form of eligibility service, vesting service or accrual service.

So viewed, therefore, the term "eligibility" could be reasonably understood two ways: as either an employee's eligibility for continued participation in benefit plans, or as eligibility to participate, but not in the status of an active employee once the employee is terminated. Neither the plain language of the Severance Plan nor the rules of construction can obviate this ambiguity. The Court finds, however, that in total context, applying the plain meaning of words and rules of grammar, a reading of the phrase "eligibility, vesting and accrual service" as expressing three independent formulations better comports with common understanding and usage than a construction that appears strained and vague by importing undefined concepts of "eligibility service" and "vesting service" under the employee benefit plans that have no readily identifiable reference in the Severance Plan itself or in applications of it cited on this record. Therefore, under do novo review, the Court adopts Plaintiffs' interpretation because Defendants have not persuaded the Court that not only is their interpretation reasonable, but that it is the only reasonable interpretation.[10]

The reasonableness of Plaintiffs' interpretation is underscored by the Haas Memo, which demonstrates that, at first, CFON itself likely interpreted the Severance Plan in accordance with Plaintiffs' interpretation. The Court acknowledges that there is still some ambiguity in the Haas Memo; however, it more clearly supports Plaintiffs' interpretation than the Severance Plan. The Haas Memo provides that "the number of weeks of base pay that an eligible employee is entitled to receive as enhanced severance benefit is treated as service for all purposes under all employee benefit plans of the Company...." (Portez Aff. Exh. F. at 1–2.) The phrase "service for all purposes," combined with the indication that such credit could be as much as 104 weeks of enhanced benefits, points to the CFON Welfare Plans being fully applicable to terminated employees during the severance period. In addition, in the Haas Memo, Defendants' argument that "eligibility" was intended to modify "service" is clearly not adopted, since the term "service" is not even included after the term "accrual" as it is in the Severance Plan. (*Id.*) Had this been such a crucial aspect of the language of § 7.4, it hardly would have been left out of an important interpretive document prepared for the signature of CFON's chief executive, most probably with assistance or review of counsel.

The examples provided in the Haas Memo are even more supportive of Plaintiffs' position. Since the weeks of service to be credited in those illustrations, 66 and 44 weeks, far exceed any applicable waiting periods, which are at most thirty days, the indication of those weeks of service as

---

**10.** The Court notes that after review of § 7.4, McDermott, counsel for Defendants, found the Severance Plan language to be ambiguous: "After reviewing the terms of the [Plan], *we are not entirely convinced* that coverage under the CFON welfare plans must be en-

hanced or extended under the [Severance Plan] ... To us, additional "eligibility service" *does not necessarily mean* additional coverage during the service period." (Stipulation Exh. P.) (emphasis added).

credit for determining "eligibility to participate, vesting and benefit accrual under all employee benefit plans" makes more sense under Plaintiffs' interpretation. (*Id.* at 2.) According to Defendants' interpretation, such long periods of credit simply have no bearing on the CFON Welfare Plans received by the employees exemplified in the Haas Memo. Both Clousing and Dreixler confirm the lack of significant benefits actually provided under the CFON Welfare Plans according to the examples in the Haas Memo, despite the allusion that benefits are conferred. (*See* Deposition of Julie Dreixler ("Dreixler Dep."), attached as Exh. V to the Poretz Aff., at 137–138; Deposition of James Clousing ("Clousing Dep."), attached as Exh. N. to the Poretz Aff., at 131–134). Furthermore, the language of the Haas Memo indicates that the weeks of service credited in the examples are "for purposes of determining eligibility to participate, vesting and benefit accrual ..." with regard to the CFON Welfare Plans. While this language is not free of uncertainty, it focuses on the relevance of the weeks of service credited for participation in the plan, thus lending itself to Plaintiffs' interpretation.

As such, it is not surprising that Defendants spend considerable effort attempting to minimize or detract from the significance of the Haas Memo. (*See* Def. Opp. Mem. at 16–20.) While, by itself, the interpretation conveyed in the Haas Memo is not dispositive, as the Court has determined the document does not qualify as an SPD, it does clearly support the reasonableness of Plaintiffs' understanding of the Severance Plan. In other words, although Defendants are correct that the Haas Memo does not supercede the language of the Severance Plan itself, since the Haas Memo does not clearly contradict the Severance Plan, it nonetheless can serve as one source of evidence confirming the reasonableness of Plaintiffs' interpretation of the ambiguous language in the Severance Plan.

Defendants put forth many reasons why their interpretation is a reasonable one: CFON past practice, compliance with underlying plans and the federal law, grammatical construction. But, given the lack of clarity in the language of the Plan, the Court is not persuaded that those reasons prove the alternative unreasonable.

Defendants' argument that Plaintiffs' interpretation is unreasonable because its application to one of the CFON Welfare Plans, the CFON 401(k) plan, is allegedly illegal is not persuasive. Just as Defendants' interpretation runs into inconsistencies and the lack of meaning under certain circumstances, i.e., the failure of a number CFON employee benefit plans even to have waiting periods, the fact that Plaintiffs' interpretation is potentially problematic in one instance does not prove that such construction is not plausible.[11] Furthermore, the fact that the term "participate" is in the Haas Memo, but not in § 7.4 of the Severance Plan, is also not fatal to Plaintiffs' reading. First, Defen-

---

11. Defendants' argue that Plaintiffs' interpretation violates federal law, which prohibits former employees from actively participating in their former employer's tax-qualified 401(k) plan. (*See* Reply Brief in Further Support of Defendants' Motion for Summary Judgment ("Def.Reply"), dated Nov. 4, 2002, at 7.) In actuality, as Defendants admit, Plaintiffs' interpretation as applied to a 401(k) plan is not per se illegal. Rather, it jeopardizes the preferential tax status of the CFON 401(k) plan. (*Id.*) For purposes of this discussion, the Court assumes that the application of Plaintiffs' interpretation of the Plan does cause certain tax difficulties, but would only cause legal problems if the 401(k) plan as interpreted by Plaintiffs was not then properly reported for tax purposes. However, the Court does not see the blatant illegality suggested by Defendants in applying Plaintiffs' interpretation.

dants' interpretation also contemplates eligibility to participate, but just not continued eligibility to participate. Regardless, the Court finds that the terms of the Severance Plan themselves are ambiguous and potentially support multiple interpretations. Finally, the rules of construction advanced by Defendants do not eliminate the ambiguity. In other words, the Court does not believe that the plain language of § 7.4 supports only one interpretation of the Severance Plan.

Thus, because the Court deems Plaintiffs' interpretation of the Severance Plan reasonable, Plaintiffs' interpretation must prevail on de novo review and, because no genuine question of material fact remains concerning this issue, Plaintiffs' interpretation prevails as a matter of law. *See Kosakow,* 274 F.3d at 739.

## F. *PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIMS*

██ Defendants argue that Plaintiffs' claim in Count II of the Complaint for breach of fiduciary duty and an order restraining the Defendants from continuing to refuse to pay the Class increased benefits, pursuant to ERISA 502(a)(3), 29 U.S.C.A. § 1132(a)(3), should be dismissed because Plaintiffs are seeking the same benefits in Count II as they are seeking in Count I under § 502(a)(1)(B).

Section 502 of ERISA, 29 U.S.C. § 1132, authorizes civil actions to enforce employee benefits plans under the statute. Subsection (a) defines specifically who may sue, for what, and against whom. The relevant provisions are:

(a) Persons empowered to bring a civil action. A civil action may be brought

(1) by a participant or beneficiary (A) for relief provided for in subsection (C) of this section, or (B) to recover benefits due to him under the terms of this plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title.

(3) by the Secretary, or by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

*(Id.)*

The Supreme Court held in *Varity Corp. v. Howe* that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (citing *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). The Second Circuit, in *Devlin v. Empire Blue Cross and Blue Shield,* 274 F.3d 76, 89–90 (2d Cir.2001), clarified this holding: "We therefore hold that *Varity Corp.* did not eliminate a private cause of action for breach of fiduciary duty when another potential remedy is available; instead the district court's remedy is limited to such equitable relief as is considered appropriate." Accordingly, the two causes of action may proceed in tandem if the district court deems it necessary.

Here, Plaintiffs argue that the relief provided under § 502(a)(1)(B) is not sufficient because "[m]any members of the Class, particularly those who would benefit under the Long Term Disability Plan (which provides continuing benefits under the age of 65), have claims that cannot be

liquidated at this point ... whose entitlements may not be established for years." (*See* Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.Opp.Mem."), dated October 21, 2002, at 23.) In their memoranda, neither party cites cases that deal specifically with the problem of the vesting of future benefits and whether § 502(a)(1) provides sufficient relief for future benefits. However, given that § 502(a)(1)(B) specifically indicates that under that section civil actions by participants are appropriate "to recover benefits due to him under the terms of this plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," there seems nothing vague about the fact that what Plaintiffs seek is precisely to secure entitlements and benefits provided for under that section.

In the Complaint, Plaintiffs seek "to enforce the provisions of the Plan, or, in the alternative, seek an injunction under § 502(a)(3) of ERISA, restraining Defendants from continuing to refuse to pay Class Plaintiffs and the Class the benefits to which they are entitled to under the Plan, or their equivalent monetary value, in an amount to be determined at the trial of this action." (Compl. ¶ 57.) Based on the remedies this pleading requests, the Court has no doubt that using actuarial processes, or another means of computing the appropriate relief, the Class members' claims can be fully satisfied under § 502(a)(1)(B), without resort to any additional equitable relief. *See Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ("Typically, however, specific performance of a contract to pay money was not available in equity" and therefore equitable remedies are reserved for incalculable damages).

In fact, in *Devlin*, the Second Circuit specifically sought to keep open the possibility of a claim under § 502(a)(3) because there was still uncertainty as to whether plaintiffs could recover under § 502(a)(1). *See* 274 F.3d at 89 ("should plaintiffs' claim under ERISA § 502(a)(1)(B) ... to enforce their rights under the plan fail, plaintiffs' breach of fiduciary duty claim is their only remaining remedy.") In its determination, the *Devlin* court specifically referenced *Varity's* concern for leaving a plaintiff without remedy for a wrong incurred. *Id.* Here, however, there is no concern that Plaintiffs' main cause of action for benefits under § 502(a)(1) will fail, since Defendants' liability with regard to it is determined herein. Furthermore, this suit is a "normal" case of denial of benefits under an ERISA plan. While, at this juncture, the Court is not considering the extent of damages or how such damages should be awarded, but only the question of liability, whatever relief is appropriate for the Class members, both as to current and future benefits, is fully recoverable under § 502(1)(B) of the ERISA statute. Plaintiffs lose nothing by the dismissal of Plaintiffs' alternative claim for equitable relief under § 502(a)(3). *See Frommert*, 206 F.Supp.2d at 439. Accordingly, there is no need for Plaintiffs' claim in Count II of the Complaint, which is dismissed.

### G. *PLAINTIFFS' BREACH OF CONTRACT CLAIM*

■ Plaintiffs' third cause of action is for breach of contract to redress Defendants' failure to provide the Class "with continued participation in the [CFON] Employee Stock Purchase Plan for their respective Severance Periods." (Compl.¶¶ 61–62.)

Defendants argue that they are entitled to summary judgment on the breach of contract claim asserted by the Class in Count III of the Complaint. They contend that Plaintiffs' breach of contract claim

should be dismissed because (i) CFON did not maintain an "Employee Stock Purchase Plan"; (ii) to the extent that the Court reads this allegation to refer to CFON's Stock Ownership Plan, none of the Class members were participants in this plan at the time of their lay-offs; and (iii) the claim is preempted by ERISA. Plaintiffs' counter that this claim is properly brought as a breach of contract claim and not under ERISA because the Employee Stock Purchase Plan is not an ERISA plan.

■ The Court decides this issue as a matter of law, and does not reach the factual issues presented by the parties. Under § 514(a) of ERISA, 29 U.S.C. § 1144(a), ERISA is to "supercede any and all State laws insofar as them may now or hereafter relate to any [ERISA] employee benefit plan." The Supreme Court has noted that the preemption clause "is conspicuous for its breadth", establishing an area of exclusive federal concern. *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). Accordingly, the preemption provision is construed broadly. *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Diduck v. Kaszycki & Sons Contractors, Inc.* 974 F.2d 270, 281 (2d Cir.1992); *Gerosa v. Savasta,* 189 F.Supp.2d 137, 146 (S.D.N.Y. 2002).

In *Ingersoll–Rand,* an employee who alleged that he was discharged in order for his company to avoid further pension contributions and payments of pension benefits, sued to recover only lost wages and punitive damages, and not lost pension benefits. 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474. Therefore, since he was not suing to recover benefits under an ERISA plan, he argued that he properly brought his suit in state court. *Id.* However, a unanimous Supreme Court held that the broad preemption provision of § 514(a) applied because the employee's suit was "related to" an ERISA-covered plan. *Id.*

Similarly, in this case, although Plaintiffs' claim to recovery under a stock option plan is not covered by ERISA, their eligibility to recover from the plan "relates to" an ERISA plan since the Class' claim is based on the interpretation of § 7.4 of the ERISA Severance Plan. The Second Circuit has instructed that "[a] state common law action which merely amounts to an alternative theory of recovery for conduct actionable under ERISA is preempted." *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 278 (2d Cir.1992). Furthermore, the instant case is not one entailing a run-of-the-mill contract claim where the connection to the ERISA plan is remote. Rather, the benefits contemplated under any alleged stock option plan are directly premised on the interpretation of the Severance Plan governed by ERISA. Therefore, Plaintiffs are not entitled to retain a separate state cause of action for benefits under the CFON Employee Stock Purchase Plan, and their third cause action is dismissed.

### III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that Plaintiffs' motion for summary judgment on Count I of the Complaint is GRANTED; and it is further

**ORDERED** that Defendants' motion for summary judgment on Count II of the Complaint is GRANTED; and it is further

**ORDERED** that Defendants' motion for summary judgment on Count III of the Complaint is GRANTED; and it is further

**ORDERED** that Counts II and III of the Complaint are dismissed; and it is finally

**ORDERED** that the parties attend a conference on Friday April 11, 2003 at 1:30 PM to discuss the process for determining the appropriate measure of damages in this case.

**SO ORDERED**.