Dawn TSAGARI, Plaintiff,

v.

**PITNEY BOWES, INC. LONG–TERM DISABILITY PLAN, Defendant.**

Civil Action No. 3:04cv662 (SRU).

United States District Court, D. Connecticut.

Feb. 9, 2007.

Richard L. Jacobs, Jacobs, Jacobs & Shannon, PC, New Haven, CT, for Plaintiff.

Andrew C. Sullivan, Joanne M. Krakora, Nicole A. Diller, Morgan Lewis & Bockius LLP, San Francisco, CA, Theodore J. Tucci, Robinson & Cole, Hartford, CT, for Defendant.

### *JUDGMENT ON THE ADMINISTRATIVE RECORD*

UNDERHILL, District Judge.

Dawn Tsagari was a participant in the long-term disability plan of the defendant, Pitney Bowes Inc. Long–Term Disability Plan (the "Plan"). Tsagari brings this action pursuant to 29 U.S.C. § 1132, the Employee Retirement Income Security Act ("ERISA"), seeking de novo review of the Plan's denial of her benefits, reinstatement of benefits, retroactive to December 10, 2002, and costs and attorneys' fees. Tsagari argues that she is entitled to a de novo standard of review of the Plan's decision, because the Plan did not comply with timing requirements under ERISA, and that under either a de novo or arbitrary and capricious standard of review, the Plan's decision was improper. The Plan argues that it substantially complied with the timing requirements, and that the Plan's decision was properly supported by the evidence in the record.

The parties have filed cross trial briefs, asking me to decide both the standard of review and the merits. I held oral argument on January 4, 2006. Based on the reasons that follow, I conclude that the proper standard of review is the arbitrary

and capricious standard. Applying that standard to the evidence in the record, the Plan's decision was not arbitrary and capricious.

## I. Factual Background

Tsagari worked as a retirement benefits counselor for Pitney Bowes, Inc. Tsagari contends that she has continually suffered from respiratory ailments, including bronchitis, asthma, and possibly fibromyalgia, resulting in scattered periods of disability. In February and April 2002, Tsagari was disabled from work on a short-term basis. She applied for and was granted long-term disability on October 1, 2002. It is the Plan's policy to place an individual on long-term disability temporarily, pending a review of the claim. On December 10, 2002, Tsagari was notified that her long-term disability would be terminated on December 31, 2002, because a physician reviewed Tsagari's records and concluded that she was not totally disabled from her occupation. On December 12, 2002, Tsagari appealed that decision. On April 21, 2003, the Plan considered her appeal and informed her on May 6, 2003 of the decision to deny her appeal.

## II. Discussion

Both parties seek judgment based on the administrative record.[1] My findings of fact and conclusions of law are set forth below. *Muller v. First Unum Life Insurance Co.*, 341 F.3d 119, 124–25 (2d Cir. 2003) (holding that a ruling on a motion for judgment on the administrative record is akin to a bench trial "on the papers"); Fed.R.Civ.P. 52(a).

### A. *Standard of Review*

At oral argument, Tsagari conceded that the Plan is discretionary, and that there-fore the arbitrary and capricious standard of review would generally apply. In this case, however, Tsagari argues that a timeliness exception applies to make the standard de novo rather than arbitrary and capricious. Tsagari conceded at oral argument that, in light of recent applicable case law, the conflict-of-interest exception does not apply.

▮ The burden of proving that the arbitrary and capricious standard is the proper standard of review falls on the Plan. *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 229 (2d Cir.1995) ("The party claiming deferential review should prove the predicate that justifies it.").

▮ Courts must review a challenge to a denial of benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B), under a de novo standard unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995). In clarifying the standard of review, the Court explicitly ruled that there was no need to consider the type of plan or the motives of the plan administrator. *Firestone Tire*, 489 U.S. at 115, 109 S.Ct. 948. "If an express delegation of discretionary authority is included within the benefit plan, courts are instructed to review an authorized fiduciary's determination with deference, not disturbing the determination unless it is arbitrary and capricious." *Rubio v. Chock Full O'Nuts Corp.*, 254 F.Supp.2d 413, 421 (S.D.N.Y.2003); *Pagan*, 52 F.3d at 441. Plan language that confers "discretionary authority," or even

---

1. At oral argument, I ruled that I would consider Tsagari's proposed exhibits 1–9 if I applied a de novo standard of review. Because the arbitrary and capricious standard of review applies, I will consider only the evidence submitted in the administrative record.

"responsibility for implementing, administering and interpreting the provisions of the policy" constitutes a grant of discretionary authority. *Rubio,* 254 F.Supp.2d at 421.

█ In this case, the Plan conferred discretionary authority on the Employee Benefits Committee ("Committee"). The Plan defines the Committee as the "plan administrator" in section 7.6 of the written plan. Administrative Record at 27. Specifically, the amended plan, effective January 1, 2000, provides: "The Employee Benefits Committee shall have discretion in exercising the following powers and duties concerning the Plan...." Administrative Record at 26, 33–34. In particular, the Plan gives the Committee the discretion to "interpret and construe the terms and provisions of the Plan, to apply such terms and provisions as the Committee may exclusively determine, to determine questions of eligibility and of the status and rights of Participants...." Administrative Record at 26. Therefore, the arbitrary and capricious standard of review applies, because the Plan gave the Committee, which is the Plan Administrator, discretionary authority to implement, administer, and interpret the terms of the Plan. *See Firestone Tire,* 489 U.S. at 115, 109 S.Ct. 948; *Pagan,* 52 F.3d at 441.

### 1. *Potential Untimeliness*

Tsagari agrees with that analysis, but argues that there is an exception to the application of the arbitrary and capricious standard, even though the Plan includes a grant of discretionary authority to the Plan Administrator. Specifically, Tsagari claims that when the Committee's benefit

determination is untimely, the de novo standard of review should apply. The Plan argues that the benefits determination was not untimely, and the time for responding was tolled during the period when the Committee was waiting for Tsagari to submit additional information needed to make a decision.

The Second Circuit has held that "absent substantial compliance with regulatory deadlines," a claim is deemed denied and subjected to de novo, not arbitrary and capricious review. *Nichols v. Prudential Ins. Co. of America,* 406 F.3d 98, 109 (2d Cir.2005). The Second Circuit did not carve out the parameters of the "substantial compliance" doctrine; however, it suggested that if a final decision is ultimately made but falls outside the regulatory deadline, the equitable tolling provisions of 29 C.F.R. § 2560.503–1(f)(4) may apply. *See id.* at 109–10.

The terms of the Plan provide that the Employee Benefits Committee will provide the claimant with a written response within 45 days of receipt of the appeal and may take an additional 45 days to decide an appeal if the circumstances warrant.[2] Administrative Record at 35 (Amendment No. 1 to the Pitney Bowes Long–Term Disability Plan § 5(e)).

The Plan also provides that, if the Committee needs additional information from the claimant in order to decide the appeal, "the time period for making a benefit determination shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request

---

**2.** Pursuant to the regulations interpreting ERISA, 29 C.F.R. § 2560.503–1(i), the plan administrator must notify a claimant of its decision within 60 days of receiving the claimant's appeal. The regulations grant a plan an additional 60 days to issue a decision if special circumstances warrant it. In this case, based on the language of the Plan, however, both counsel agreed at oral argument that the applicable time frame here was an initial period of 45 days, and then an additional 45–day extension if circumstances warrant.

for additional information...." Administrative Record at 35 (Amendment No. 1 to the Pitney Bowes Long–Term Disability Plan § 5(e)). In addition, 29 C.F.R. § 2560.503–1(f)(4) also provides for tolling of the decision-making deadline during the time that the claimant is responding to the Plan's request for additional information. The regulation provides:

> [T]he period for making the benefit determination shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

*See also* Administrative Record at 77 (notifying Tsagari of Plan's timing provisions).

Tsagari notified the Plan of her intent to appeal on December 16, 2002. Administrative Record at 78. In that letter, she told the Plan that she wanted it to evaluate her appeal in light of her fibromyalgia diagnosis, which had not been a factor in her original determination of benefits. Administrative Record at 78 ("The fact that ... I have Fibromyalgia ... must be given considerable weight in any decision."). At that point, the parties conducted a back-and-forth exchange of information. Administrative Record at 77–93. Specifically, on January 2, 2003, the Plan asked Tsagari for medical records (from Dr. Vietoritz and Dr. Jose) documenting her fibromyalgia condition, so that it could consider them on her appeal. Tsagari had specifically requested that the Plan obtain the records of those two doctors and consider them before making a decision on her appeal. Administrative Record at 78. In the January 2, 2003 letter, Barbara Bianco, the case manager for Tsagari's claim, reminded Tsagari that it was her responsibility to make sure the Committee received the necessary physicians' records.

Administrative Record at 79. Tsagari replied on January 7, 2003, but her reply did not include the requested medical records. Administrative Record at 80. On January 9, 2003, Bianco again requested the necessary medical records, indicating that Tsagari had not yet provided them. Administrative Record at 82. Bianco also requested that Tsagari see at least two other doctors to independently verify her fibromyalgia diagnosis: Dr. Marcus and Dr. Logue. Administrative Record at 85.

The period of time for deciding an appeal of a benefits determination begins on the date when the claimant files an appeal, even if all of the information necessary to decide the appeal does not accompany the filing. 29 C.F.R. § 2560.503–1(i)(4). Here, the period of time for deciding the appeal began to run around December 16, 2002.[3] When a Plan extends the time for deciding a claim due to the claimant's failure to submit necessary information to decide the appeal, the tolling period commences on the date when the Plan notifies the claimant that it is seeking the extension, and the tolling period continues until the claimant provides the necessary information. 29 C.F.R. § 2560.503–1(i)(4). The notification of the extension must occur prior to the termination of the initial decision-making period. *See* 29 C.F.R. § 2560.503–1(i)(1)(i). Here, the Plan argues that the January 9, 2003 letter triggers the tolling period, because that letter requested medical information from Tsagari that was necessary to make a decision. That letter does not explicitly notify Tsagari of the Plan's intent to seek an extension. On February 21, 2003, the Plan extended the deadline to decide the appeal. Administrative Record at 88.

**3.** Tsagari dated her appeal letter December 16, 2002, but it is not clear when the Plan received the letter of appeal.

The Plan technically did not comply with the timing requirements, because it should have notified Tsagari of its intent to seek a 45–day extension by about February 2, 2003. At that time, the tolling period would have commenced, because it sought the extension due to Tsagari's failure to submit the information necessary to decide the claim. Within the initial 45–day time period, the Plan promptly and repeatedly notified Tsagari that she needed to provide additional information, so that the Plan could consider her fibromyalgia diagnosis on appeal, in accordance with Tsagari's request. *See, e.g.,* Administrative Record at 79 (letter dated January 2, 2003), 82 (letter dated January 9, 2003), 85 (letter dated February 6, 2003). The Plan's February 21, 2003 letter provided notice to Tsagari of its intent to seek a 45–day extension, and that letter also triggered the tolling period, because the Plan needed the extension in order to collect all of the information necessary to decide the appeal. Tsagari never submitted the information needed for the appeal, so the tolling period continued until May 6, 2003 when the appeal was decided.

█ Thus, the Plan informed Tsagari of its need for additional information, which is a proper basis for tolling; the Plan also informed Tsagari of its intent to take a 45–day extension. The noncompliant aspect of the Plan's conduct was that it was just over two weeks late in providing the notice to Tsagari of its intent to take an additional 45–days. The Plan should have given notice to take an additional 45 days when it informed Tsagari that it needed additional information, which was well within the initial 45–day time frame. Despite its two-week delay, I conclude that the Plan substantially complied with the timing requirements. *See Nichols,* 406 F.3d at 109; *Pava v. Hartford Life and Accident Insurance Company,* 2005 WL 2039192, *9 (E.D.N.Y. Aug. 24, 2005). In *Pava,* the district court ruled that substantial compliance with the regulatory deadlines is sufficient to uphold the application of an arbitrary and capricious standard of review. The court reasoned that the Second Circuit, in *Nichols,* "explicitly declined to foreclose the application of the substantial compliance exception in situations such as the one presented here." *Id.* In *Pava,* the defendant and the claimant were in regular contact; the defendant had to procure medical records from the claimant's doctors; and the defendant had to follow up with the doctors. *Id.* at *9–10. Based on those facts, the district court concluded that the "pattern of interaction between the parties demonstrates that Plaintiff sought and waited for Hartford to exercise its discretion...." *Id.* at *10. The court also reasoned that there was no bad faith on the part of the defendant. *Id.*

In contrast, the issue in *Nichols* was whether substantial compliance could block or delay a plaintiff's access to courts—not the standard of review applicable once the plaintiff gets to court. Although *Nichols* reversed the underlying district court decision, it did not do so based on the district court's reasoning about the standard of review to be applied if the defendant is in substantial compliance with regulatory deadlines. *See Pava,* 2005 WL 2039192 at *9. As a result, the *Pava* court relied on the district court's reasoning in *Nichols:*

> when the administrator identifies appeals that may warrant additional scrutiny and begins in good faith to investigate and consider that claim within a period manifesting substantial compliance with the regulatory limits and notifies the claimant that it is doing so, that process should be allowed to run its course for a reasonable time, as long as the administrator continues to exhibit good faith.

*Id.* (quoting *Nichols v. Prudential,* 306 F.Supp.2d 418, 423 (S.D.N.Y.2004), *vacated*

*on other grounds*, 406 F.3d 98 (2d Cir. 2005)).

Similarly, in this case, there was a continual back and forth between Tsagari and the Plan, in which both sought information from the other. The Plan requested medical information to follow-up on Tsagari's appeal and introduction of the fibromyalgia diagnosis. Finally, there is no apparent evidence of bad faith, despite the conclusory arguments in Tsagari's trial brief. Although its timing was not perfect, the Plan substantially complied with the applicable deadlines. As a result, tolling applied from February 21, 2003 through May 6, 2003, and the Plan therefore decided the appeal within the applicable period. Thus, the timing exception does not apply, and the arbitrary and capricious standard of review governs this appeal.

### 2. *Potential Conflict of Interest*

At oral argument, Tsagari withdrew her argument regarding a potential conflict of interest. Even if she were to pursue it, there is no evidence of an actual conflict, and as such, the exception does not apply.

▉ In order for a conflict of interest to require a de novo standard of review, the plaintiff must show that the administrator was in fact influenced by the conflict of interest. *Pava*, 2005 WL 2039192 at \*10 (citing *Sullivan v. LTV Aero. & Defense Co.*, 82 F.3d 1251, 1255–56 (2d Cir.1996); *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir.2000)); *Mood v. Prudential Insurance Company of America*, 379 F.Supp.2d 267, 274 (E.D.N.Y.2005) (citing *Fay v. Oxford Health Plan*, 287 F.3d 96, 108–09 (2d Cir.2002)). In *Pava*, the District Court held that conclusory allegations about a conflict of interest were insufficient to warrant a de novo standard of review. *Pava*, 2005 WL 2039192 at \*10.

Here, there is insufficient evidence to indicate that the Plan had an actual conflict of interest. Therefore, the arbitrary and capricious standard of review applies.

### B. *Merits*

▉ When the arbitrary and capricious standard of review applies, a decision by a plan administrator may be overturned only if the decision was " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Mood*, 379 F.Supp.2d at 274 (quoting *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999)). "Substantial evidence is that which a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Id.* (internal quotations omitted). If both parties offer rational, but conflicting interpretations, the plan interpretation controls. *Id.*

Under the terms of the Plan, eligibility for total disability benefits is based on whether a potential beneficiary is "unable to perform the material duties of her own occupation...." Administrative Record at 11. The Administrative Record at 69–72 provides a summary of what the Committee considered in making its determination. In making its final disability determination, the Committee considered the opinion of Dr. Broder, a physician consultant that the Plan hired to review Tsagari's medical reports. Dr. Broder concluded that Tsagari "is functionally, physically, neuropsychiatrically, [and] psychiatrically capable of performing her occupational duties for Pitney Bowes." Administrative Record at 233. He also concluded that Tsagari's condition was "compatible with conscious forcing." Administrative Record at 224. Dr. Broder concluded that Tsagari's lab studies were normal. Administrative Record at 223. Dr. Broder's January 14, 2003 report also contains other observa-

tions that discredit Tsagari's symptoms and the conclusions of her own doctors. For example, he concluded that the results of the FEV 1 (Forced Expiratory Volume in 1 second) and FVC (forced vital capacity) were questionable, because the patient could control the results and was therefore capable of conscious forcing. Administrative Record at 223. He also concluded that the physical examinations by Drs. Vietorisz and Jose did not meet the published criteria of the American College of Rheumatology. In short, the Committee considered Dr. Broder's report, as well as the observations of various other doctors, to conclude that Tsagari did not meet the total disability standards under section 2.33 of the Plan.

The Committee also reviewed other medical reports in making its decision. For example, a radiologist's report indicated that Tsagari had a normal chest X-ray. Administrative Record at 179. Dr. Mahony, an attending physician at Norwalk Hospital, concluded that Tsagari showed no evidence of pulmonary disease; she had a normal EKG; and underwent several other tests, which produced normal results. Administrative Record at 148. In the same report, Dr. Mahony delineated a list of medications that Tsagari was taking, indicating that she had reactive airway disease and hypertension, but he did not conclude that she could not perform her job. Administrative Record at 148.

Tsagari also underwent a neuropsychiatric evaluation, which determined that she had no neuropsychiatric symptoms that would interfere with occupational functioning. Administrative Record at 116. Dr. Marcus, a pain specialist, concluded that Tsagari's symptoms were not consistent with a specific diagnosis, and that many of her difficulties were the product of somatoform pain disorder. Dr. Marcus found that she had no objective airway disease. Administrative Record at 95. Dr. Krins-

ley, a pulmonary specialist, concluded that Tsagari had acute bronchitis with no malignancy and "surprisingly unremarkable airways." Administrative Record at 76. Two physicians reviewed Tsagari's bronchoscopy and found it to be negative. Administrative Record at 74, 76, 126.

The Committee also considered that environmental testing of Tsagari's workplace showed that there were no health hazards but that carbon dioxide levels were high. That issue was apparently resolved by increasing the amount of outside air flow to the work area. Administrative Record at 71, 235–36.

Although Dr. Vietorisz diagnosed Tsagari with fibromyalgia, other doctors who evaluated Tsagari concluded that the diagnosis was heavily based on Tsagari's self-reporting and was therefore questionable. The Committee's decision and reasoning is found at the Administrative Record at 63–65. The Committee concluded that, even considering the physical symptoms Tsagari suffered, she would be able to perform her job.

The Committee's decision that Tsagari was not totally disabled was a rational interpretation supported by more than a scintilla of evidence. Tsagari argues, however, that the Committee selectively considered certain information and ignored other information. She argues that the Committee failed to obtain medical records from Dr. Boubulis after it represented that it would. The record clearly indicates, however, that Bianco instructed Tsagari on numerous occasions that it was Tsagari's responsibility to procure medical records. Administrative Record at 79, 82, 92.

Tsagari also argues that it was arbitrary and capricious for the Committee to credit Dr. Broder's opinion in making its decision, because Dr. Broder is not credible or accurate. In his January 14, 2003 letter, Dr. Broder concluded that

Tsagari's reported symptoms had not been supported by objective diagnostics. Administrative Record at 224. He made that conclusion after considering the medical evidence in the record, including the records of Dr. Krinsey, Dr. Jose, and Dr. Vietorisz. Dr. Broder based his conclusion on the fact that Tsagari's bronchial biopsy results were normal, as noted in Dr. Krinsey's report. Dr. Broder wrote a letter to Dr. Marcus requesting his evaluation and assessment regarding whether Tsagari could perform the functions of her job. Administrative Record at 225. Dr. Marcus conducted a focal point test on Tsagari to measure the pain she felt in response to different levels of pressure. He found that she reported pain when no pressure was applied, creating the inference that Tsagari was exaggerating her symptoms. Administrative Record at 227. He also determined that "she does not have any findings that are consistent with a diagnosis of objective muscle pain consistent with any specific diagnosis." Administrative Record at 227. Finally, Dr. Marcus suggested that Tsagari would benefit from a psychiatric assessment, because his findings did not suggest that she suffered from any specific physical diagnosis. Administrative Record at 227.

Those results, in part, contributed to Dr. Broder's conclusion that Tsagari was not afflicted with fibromyalgia and was able to fully perform the functions of her job. Administrative Record at 227–33. Dr. Broder further concluded that Tsagari had no objective muscle pain consistent with a specific diagnosis. *Id.* at 227. In his final evaluation, Dr. Broder considered Dr. Marcus's findings, as well as Dr. Logue's 21–page comprehensive forensic neuropsychiatric evaluation, in which he concluded that there was no clear evidence that Tsagari suffered from psychiatric or neuropsychiatric conditions. Administrative Record at 230.

Finally, Tsagari argues that there is certain information in the record that is inconsistent with the Committee's finding. There is no question that there is information in the record that would support an alternate finding. If the parties offer conflicting analyses, however, the Plan analysis must control. *See Mood,* 379 F.Supp.2d at 274 (citing *Kinstler,* 181 F.3d at 249). There is more than a scintilla of evidence supporting the Committee's decision.

### III. Conclusion

I conclude that the Plan substantially complied with the applicable timing requirements and that once the Plan gave Tsagari notice of its intent to seek an additional 45 days to decide the appeal, the timing requirements were tolled. Therefore, the arbitrary and capricious standard of review applies, and I hold that the Committee's decision was reasonable and supported by substantial evidence. The clerk shall enter judgment in favor of the defendant and close this case.

It is so ordered.